IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

October 26, 2021 Session

**STATE OF TENNESSEE v. JACOB EVAN COYNE**

**Appeal from the Criminal Court for Hamilton County
No. 302955, 302968 Thomas C. Greenholtz, Judge**

_____

**No. E2020-01655-CCA-R3-CD**

_____

The Defendant-Appellant, Jacob Evan Coyne, was convicted by a Hamilton County jury of first degree premeditated murder, felony murder, and especially aggravated robbery. See Tenn. Code Ann. §§ 39-13-202 (first degree murder); 39-13-403 (especially aggravated robbery). He received a total effective sentence of life plus 15 years. On appeal, the Defendant argues that the evidence was insufficient to support his convictions because the State failed to show (1) evidence of premeditation, (2) evidence that the victim was robbed or that the Defendant intended to rob the victim, and because (3) evidence that was favorable to the Defendant was not given appropriate weight at trial. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JILL BARTEE AYERS, JJ., joined.

John G. McDougal, Chattanooga, Tennessee, for the Defendant-Appellant, Jacob Evan Coyne.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Neil Pinkston, District Attorney General; and Andrew Coyle, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On September 20, 2017, the Hamilton County Grand Jury returned an indictment against the Defendant for one count for the March 11, 2017 first degree premediated murder of Jalen Little. The grand jury later returned a second indictment against the

Defendant and Zachary Adam Chadwick for the felony murder and especially aggravated robbery of Little. These indictments were later consolidated.

At the February 25-28, 2020 trial, Dontae Little,[1] the brother of Jalen Little, testified that he and Little met Chadwick in elementary school. He stated that on March 11, 2017, he was "hanging out with" and smoking marijuana with his friend, Shane Brown, at the home he shared with his mother and siblings. Dontae and Brown were outside smoking marijuana when Little arrived at the home. Dontae testified that his brother seemed "like he was stressing" about something, and he declined to partake in smoking marijuana. Inside the home, Little showed Dontae and Brown "money fanned out in his hand" and was "bragging like, ['O]h, I got this money.[']" Soon after Little showed them the money, their friend, Alex Thompson, arrived at the home. Dontae, Brown, and Little got into Thompson's Jeep, and Little showed Thompson the money, to which Thompson replied that Little owed him money. Little told Thompson that he had to go back into the home to get change with which to pay him. While Little was inside the house, Dontae noticed a dark-colored four-door sedan pull up to the house and park next to the mailbox. "[N]ot even ten seconds" later, two people exited the sedan, ran up the driveway, and stood directly outside of Thompson's Jeep, which was still occupied by Dontae, Brown, and Thompson. Dontae described the two individuals as a taller person and a shorter person. Little then exited the house, and the shorter of the two individuals asked Little, "[W]here's my money[?]" Although the two individuals had their hoods pulled over their heads, Dontae recognized the voice as belonging to Chadwick. [Id.]. Approximately five seconds later, Dontae heard gunfire. Little "reach[ed] in his pockets and thr[ew] out the money[,]" but "the gun fire ke[pt] going until it click[ed], until it's empty." The two individuals then ran back to the dark sedan and drove away. Dontae clarified that it was the taller of the two individuals who fired the gun. He heard approximately fifteen gunshots.

As soon as the two individuals ran back to the sedan, Dontae exited the Jeep and ran to Little. Dontae observed "bullet holes in [Little's] shoulder and his legs." Little was still talking and able to move his head back and forth when Dontae approached him. Dontae and Little's mother and 13-year-old sister exited the house and observed Little lying on the ground. Dontae estimated that eight to twelve minutes elapsed between his calling 911 and EMS arriving. Dontae collected the money that Little had thrown on the ground and placed it in the home before police arrived. Dontae was also transported to the hospital because he was nauseated and vomiting, and he was told at the hospital that he had "heartbreak syndrome." While Dontae was in the hospital, his mother informed him that Little had

---

[1] Because the witness and the victim share the same surname, we refer to the witness by his first name. We intend no disrespect in doing so.

passed away from his gunshot wounds. Dontae testified that neither he, Little, Alex, or Shane possessed a firearm.

On cross-examination, Dontae clarified that the two individuals were standing directly outside the window where Dontae was sitting in the Jeep when the shooting occurred. Little did not say anything to the two individuals, and he was shot "when he put his hands in his pocket." He definitively reiterated that it was the taller individual, not the shorter individual, who actually fired the gun. Dontae thought that Little was first shot in the chest and was shot a total of 13 times. The individuals did not attempt to retrieve the money that Little threw on the ground. Dontae agreed that Little's Instagram account contained an image of Little holding a firearm but denied that the firearm belonged to Little or that he possessed it at the time of this death. Dontae testified that the shorter individual was approximately a step and a half behind and to the right of the taller individual. The taller individual "didn't hold the gun steady" while firing it at Little. Brown and Thompson left the home after Dontae called 911 but before police arrived. Dontae testified that although Thomson's Jeep had tinted windows, he was still able to see what occurred because there was a street lamp "parallel to the mailbox and across the street." He agreed that he retrieved the money from the ground and put it under a pillow on a mattress and that the money had Little's blood on it.

On redirect examination, Dontae testified that he had never met the Defendant or heard Little mention the Defendant. He also never saw Brown or Thompson with the Defendant. On recross-examination, Dontae agreed that he had not met every single person with whom his brother was friends.

Chattanooga Police Department ("CPD") Officer Jerry McElroy testified that he worked as a crime scene investigator. He explained that it was his job to collect evidence and document crime scenes. He elaborated that he only collected items from crime scenes that held "evidentiary value[.]" Officer McElroy testified that was called to the instant crime scene on March 12, 2017, and arrived at 1:40 a.m. He agreed that it was 32 degrees Fahrenheit with snow on the ground when he arrived at the scene. Officer Nelson, who was also a crime scene investigator, was also assigned to the crime scene. Officer McElroy agreed that the crime scene was located at 820 Oaktree Drive. Little had already been transported to the hospital when Office McElroy arrived. Officer McElroy recovered 15 nine-millimeter shell casings from the crime scene. He also collected a pair of shoes, a pair of black sweat pants, multiple bullets that had been fired, three quarters, a dime, and two $20 bills. He later recovered a fired bullet from the sweat pants. Officer McElroy explained that he did not typically seal and label evidence at the crime scene but would take it back to the crime scene office and secure it before sending it to the "property facility." Officer McElroy testified that inside of the Oaktree Drive residence, he recovered $880 in cash that was "in a bedroom on a lower bunkbed underneath a blue comforter."

Multiple bills had holes in them and had a red substance that Officer McElroy "believe[d] to be blood[.]" The same was true for the two $20 bills he recovered from outside the residence. Officer Holloway, a patrol officer, also brought Little's property from the hospital to the crime scene. Photographs taken of the crime scene by Officer McElroy were admitted as exhibits.

Officer McElroy testified that he processed Eddie Valenzuela and Alyssa Roberts for evidence on the morning of March 12, 2017. Officer McElroy photographed Valenzuela, collected a DNA sample, and collected a gunshot residue ("GSR") kit from his hands. He also photographed Roberts and collected a DNA sample from her. Officer McElroy also processed Valenzuela's Kia Optima. He swabbed the car's interior and exterior door handles, steering wheel, and gear shift for DNA. Officer McElroy also collected a GSR kit from the car. He also collected a blood sample, bullets, and nail clippings from Little's body at the medical examiner's office.

On cross-examination, Officer McElroy agreed that he did not start processing the crime scene until after Little had been transported to the hospital. He also agreed that all of the shell casings he recovered were concentrated in the driveway. Officer McElroy testified that apart from the money found on the bunk bed and a "little green ball of fuzz[,]" no evidence from the shooting was recovered inside the residence. He reiterated that he collected DNA swabs and a GSR kit from the Kia Optima.

CPD Officer Ken Burnette, Jr., testified that Officer McElroy called him to the crime scene in March 2017 as a crime scene technician. However, upon arrival, Officer McElroy requested that he respond to a potential "secondary scene" that was located at a residence on Meadowood Drive.[2] Officer Burnette explained that a party had occurred earlier in the night at the Meadowood Drive residence, which was occupied by Chadwick and his mother. When Officer Burnette arrived at the residence, Chadwick had already been taken into custody. His vehicle, a gold Nissan Pathfinder, was still running in the driveway. Officer Burnette obtained permission from Chadwick's mother to search both the vehicle and the residence. He collected a white cell phone and Chadwick's wallet from the Pathfinder. Officer Burnette collected multiple air rifles, a nine-millimeter Smith & Wesson magazine, two live nine-millimeter rifle rounds, a "crack pipe[,]" and a driver's license from Chadwick's bedroom. After returning to the CSI office, Officer Burnette was asked to process Chadwick, and he photographed him and collected his fingerprints, a DNA sample, and a GSR kit. Later that day, Officer Burnette was dispatched to a "wooded area" behind a residence to process a pistol that the sheriff's department had recovered. Officer Burnette testified that the pistol was Smith & Wesson brand and did not contain any ammunition when he recovered it, but he also discovered a box of ammunition near the

---

[2] We note that this street name is also referred to as "Meadowwood Drive" in the record on appeal.

pistol. The box contained six live rounds, and both the ammunition and pistol were nine-millimeter. Officer Burnette testified that the pistol's magazine had a 15-round capacity. Officer Burnette also processed Andrew Beeby the same day and photographed him and collected his fingerprints and DNA.

Officer Burnette testified that on March 14, 2017, he was dispatched to process the Defendant and was given the Defendant's shirt to process. He photographed the Defendant and took a DNA sample and his fingerprints. Officer Burnette testified that he did not have any further involvement with the case until a year later, when he was asked to process a bullet fragment that had been removed from Little during surgery the previous year.

On cross-examination, Officer Burnette reiterated that he only found air rifles and no nine-millimeter firearm in Chadwick's bedroom. He agreed that when he processed Chadwick, he removed money from his person that did not contain any bullet holes or blood-like substances. He agreed that he did not test the recovered pistol or ammunition for DNA or fingerprints. On redirect examination, Officer Burnette clarified that the Tennessee Bureau of Investigation ("TBI") typically processed evidence for DNA.

TBI Special Agent Blake Jetron testified that he was employed as a CPD patrol officer in March 2017 and was the first officer to arrive at the crime scene in response to Dontae's 911 call. Upon arriving at the crime scene, Agent Jetron observed Little lying on his back in the driveway and heard Little's mother screaming for help. Agent Jetron approached Little and noticed dollar bills, shell casings, and blood around his body. He described Little as "riddled with bullets." Little began "going in and out" of coherency. Agent Jetron was holding Little's hand while waiting for EMS to arrive and noticed that Little's extremities were getting cold, and Little began shaking. Agent Jetron asked Little who had shot him, and Little responded, "Zac Chadwick." Agent Jetron testified that his precinct had not yet been allocated body cameras in March 2017, so he radioed dispatch and told them what Little said as soon as Little was placed in an ambulance. He explained that Officer Nick Hayes secured the scene with crime scene tape, and the case was "handed over" to the major crimes division.

On cross-examination, Agent Jetron clarified that Little told him verbatim, "Zac Chadwick. Zac Chadwick shot me." Agent Jetron asked Little for a description of Chadwick, and Little told him that Chadwick was "a white guy . . . maybe from Red Bank."

TBI Special Agent Kyle Osborne testified that he was employed as a forensic scientist. He was received by the court as an expert in forensic microanalysis. Agent Osborne examined the nine-millimeter Smith & Wesson pistol and testified that GSR residue would typically be emitted "in the range of six feet" when the trigger was pulled. He explained that environmental factors could affect this range, including melting snow,

and a person washing his or her hands "would remove residues." He testified that the presence of GSR on a person would indicate that a person "either fired the weapon, was around a weapon that was discharged, or handled a weapon that had recently been fired." Agent Osborne elaborated that a recently-fired weapon could also leave GSR residue in a vehicle. He testified that a weapon that was fired 15 times would not cause GSR residue to travel a farther distance but would cause a higher concentration of GSR in the typical six-foot range. Of the GSR kits that were collected from Valenzuela, the Kia Optima, the Defendant's shirt, and Chadwick's clothing, Agent Osborne found traces of GSR on Chadwick's pants. Agent Osborne also found traces of GSR on the rear exterior passenger door of the Kia Optima.

On cross-examination, Agent Osborne reiterated that GSR can transfer from a person's hands or clothing to other objects and clarified that the ability to find GSR on a car seat "can depend on the type of material as well as time." He explained that he did not test Chadwick's belt or shirt for GSR because he already found GSR on Chadwick's pants.

TBI Special Agent Alyssa Manfredi testified that she was employed as a forensic scientist and was received by the court as an expert in forensic biology specializing in DNA and serology. Agent Manfredi received DNA samples for Chadwick, Valenzuela, Roberts, Little, and the Defendant from the CPD. She also received fingernail clippings taken from Little. Agent Manfredi found Little's blood on the fingernail clippings and another individual's DNA, but she was unable to determine to whom the DNA belonged. Her report was received an exhibit.

TBI Special Agent John Dunn testified that he was employed as a forensic scientist and was received by the court as an expert in latent fingerprint identification. He explained that fingerprints are "fragile" and could be "wiped away" or affected by weather. Agent Dunn processed the pistol and magazine he received from the CPD but was unable to locate any latent fingerprints. On cross-examination, Agent Dunn reiterated that he did not find any fingerprints on the pistol or magazine.

TBI Special Agent Jessica Hudson testified that she was a forensic scientist employed in the firearm and toolmark identification unit in March 2017. Agent Hudson was received by the court as an expert in forensic firearm analysis. Agent Hudson testified that she examined the pistol and magazine that were recovered from the wooded area. She explained that the pistol was a Smith & Wesson nine-millimeter semi-automatic weapon and was capable of holding 17 rounds. Agent Hudson testified that shell casings could have class characteristics, which were "predetermined by at the manufacturer prior to the gun being made[,]" and individual characteristics, which she described as a "mechanical fingerprint[.]" She elaborated that shell casings would have an imprint of the firing pin from the gun they were fired from. Bullets had characteristics including caliber and the

number and width of lands and grooves. Agent Hudson definitively determined that the shell casings recovered from the Oaktree Drive residence were fired from the recovered pistol. The bullets recovered from Little were also fired from the recovered pistol. Agent Hudson testified that the nine-millimeter Smith & Wesson magazine found in Chadwick's bedroom "fit[] and function[ed] properly" in the pistol, and she was able to "use[] the magazine that came with the gun and also th[e magazine from Chadwick's bedroom] to test fire" the pistol. The ammunition that was recovered with the pistol from the wooded area was "consistent in design as the cartridge cases and bullets" recovered from Oaktree Drive. Agent Hudson processed the jacket that Little was wearing when he was shot but was unable to determine conclusively exactly the distance from him that the shooter was standing. She opined that the shooter was at least four feet away form Little when he shot him.

On cross-examination, Agent Hudson clarified that the shooter was "most likely" at least four feet away from Little when he shot him, but she explained that the fleece jacket would not "hold" the gunpowder particles as well as "regular denim or cotton clothing[,]" and "rough handling" of the jacket by EMS or the medical examiner could also affect the amount of gunpowder left on the jacket. She affirmed that she did not know who had fired the gun.

TBI Agent Denver Hall testified that he was employed in the firearm and toolmark identification unit. He was received by the court as an expert in forensic firearms analysis. Agent Hall testified that he received a bullet that was taken from Little's body at the hospital. He was able to determine that that bullet definitely was fired from the nine-millimeter Smith & Wesson pistol that was recovered from the wooded area. On cross-examination, Agent Hall explained that Agent Hudson had test-fired the gun, and he was able to compare the bullet from Little's body to the bullets from the test fire.

Alyssa Roberts testified that she was a 17-year-old high school senior in March 2017. Roberts testified that she met Chadwick through Andrew Beeby and had known him for "two or three weeks" prior to March 2017. She was Facebook friends with Little and thought they met once "when [they] were like 14[.]" She met Valenzuela on the night of March 11, 2017. She had known Beeby since she was "about three years old" and met the Defendant on March 10, 2017, at Chadwick's house. Roberts testified that she went to Chadwick's house on March 11, 2017, and arrived at approximately 8:00 p.m. Chadwick, Little, Beeby, and a "guy named Shelly" were already at the house when Roberts arrived. At some point, Roberts, Chadwick, and Little went to a Waffle House restaurant to buy "[a] pound of marijuana[.]" Roberts testified that Chadwick had given Little "around 900 and something dollars to purchase the marijuana." When the trio arrived at the Waffle house in a car driven by Chadwick, Little got out of the car to purchase the marijuana[,] "and he just never came back." Roberts and Chadwick waited for Little to return for

"[m]aybe 45 minutes to an hour and 15 minutes" and tried to reach him via text, phone call, and Facebook messenger. Little never responded, and Chadwick became "angry." Chadwick drove Roberts back to his house, and the Defendant, Beeby, and Valenzuela were there. The group saw that Little posted that he was "Atlanta-bound" on social media. Another unknown individual arrived outside Chadwick's house, and everyone except Roberts went outside. When the group came back inside, Beeby realized that Little was still in possession of Chadwick's iPhone, and Beeby used "Find My iPhone" to locate Little in Red Bank. The Defendant told Chadwick that "[T]hey were going to handle it. That it was going to get fixed." Valenzuela then drove the Defendant, Chadwick, and Roberts to Red Bank in his car. Roberts sat behind the driver's seat, the Defendant sat in the front passenger seat, and Chadwick sat behind the front passenger seat. Roberts testified that there was no discussion about "anything [that] was about to happen" on the way to Red Bank. She elaborated that "it didn't seem like anything really bad was going to happen."

Roberts testified that Chadwick and Little had been friends for approximately nine years, and she believed that "they were going to get the money back[,]" but she "didn't think anything really bad was going to happen." Before arriving at Little's house, the Defendant told Chadwick "to get ready, that they were going to get out." Upon arriving at Little's residence, Chadwick and the Defendant got out of the car and walked up to Little. The Defendant "already had the gun pulled at" Little. Roberts testified that the Defendant asked Little where the money was, and Little said, "[A]l[]right, Fam," and was "about to pull out his pockets" when the Defendant shot him. Roberts elaborated that the Defendant "approached" Little, but Chadwick "kind of stayed maybe a couple of feet behind him." She reiterated that Chadwick stayed "[m]aybe two feet, three feet" behind the Defendant. Roberts testified that her car window was "just cracked" because she was smoking a cigarette, and she "could barely hear anything[.]" She could not clearly see Little but saw "him shift, and [she] thought he was reaching into his pocket." The Defendant then "pulled the trigger[,]" and Roberts saw "the gun off[,]" and "[t]he whole yard lit up." The Defendant fired the gun "until it was done, 'til the whole clip was gone." After the shooting, the Defendant got back inside the car, and Chadwick was already inside the car. The Defendant handed Chadwick a $20 bill and told Chadwick, "I'm sorry, I could only get twenty dollars." Roberts testified that she did not know that the Defendant had a gun until he pointed it at Little. Following the shooting, Valenzuela drove the group back to Chadwick's house. Roberts, the Defendant, and Chadwick exited the car, and Valenzuela drove away. The Defendant, Roberts, Chadwick, and Beeby then went to Beeby's house. At Beeby's house, the Defendant stated that he "had to get rid of" the gun. The Defendant then "disappeared in the woods" near Beeby's house, and Roberts did not see the gun when the Defendant returned. The Defendant and Beeby traded shirts, and Chadwick and the Defendant left Beeby's house. As they were leaving, Roberts told Chadwick to "do the right thing" and "turn himself in." Beeby walked Roberts to her home and gave her the Defendant's shirt. Roberts put the shirt in her dirty clothes hamper, and her "grandmother

accidentally" washed it. Roberts was contacted by police a "couple of days" later, and she went to the "police service center" where she was interviewed and identified the Defendant as the shooter. She agreed that she had testified at the preliminary hearing that the Defendant was the shooter, had never identified anyone other than the Defendant as the shooter, and that the Defendant was taller than Chadwick. Roberts testified that Chadwick had called her multiple times from jail and was present when she testified at the preliminary hearing.

On cross-examination, Roberts testified that she purchased marijuana from Chadwick on two occasions, and they were flirtatious with each other. She agreed that Chadwick told her he would give her some of the marijuana that he planned to purchase at Waffle House. She clarified that she did not actually witness Chadwick give Little the $900 to purchase the marijuana. Roberts testified that she saw the Defendant pull the gun from "his waist[,]" specifically "from the front part of his body." She denied that she brought her backpack with her in Valenzuela's car and that the Defendant pulled the gun out of her backpack. Roberts agreed that she did not hear Chadwick say anything but reiterated that she was not "100 percent" sure what was said. [She testified that she could only see "the top of [Little's] head" because he was hidden behind a van in the driveway, but she could clearly see the Defendant and Chadwick. She elaborated that Little was standing "at the passenger side of the white van." She reiterated that the Defendant and Chadwick were not standing behind the van, so she could see them clearly. Roberts testified that the Defendant did not personally "have any money in this[,]" but was trying to help get the money back because he was friends with Chadwick. She agreed that she was "[f]ive to ten feet" away from the white van when the shooting occurred. Roberts reiterated that she did not hear Chadwick say anything to Little before the shooting. She did not see the Defendant take a $20 bill from Little. She did not see the Defendant with a box of ammunition. Roberts did not know whether the white van had tinted windows or whether anyone was inside the van at the time of the shooting.

Dr. James Metcalf testified that he was the Chief Medical Examiner for Hamilton County and was received by the court as an expert in forensic pathology. Dr. Metcalf testified that Little's manner and cause of death were homicide and multiple gunshot wounds, respectively. Dr. Metcalf explained that although Ketamine was in Little's system when he died, it was administered at the hospital and was in his medical records. Little also had nicotine in his system at the time of his death but did not have any "illicit or illegal drugs in his system[.]" Dr. Metcalf determined that Little had 14 gunshot wounds, and Dr. Metcalf was unable to determine the range from which Little was shot because there "was no powder or stippling on the skin." He testified that some of Little's gunshot wounds were perforating, meaning the bullet went "all the way through[,]" and some were penetrating, meaning the bullet was sill in the wound tract. One of the gunshot wounds "damaged the muscle and broke the upper fibula" of Little's left leg. Another gunshot

wound damaged the muscle in Little's right left. Another gunshot wound "tore muscle tissue and broke the upper end off the larger leg bone" in Little's right leg. Little also had a "graze wound" on his right leg. His left leg also had a "shallow" gunshot wound and a gunshot wound that was "a little deeper" in his left thigh, with the entrance wound in the back of his thigh. Little's right buttock also had an entrance wound, and that wound tract went through his kidney, liver, and diaphragm, and the bullet "ended up in the right chest." Dr. Metcalf testified that such a wound would have been fatal. Little also had an entrance wound in his left buttock, and that bullet went through his pelvis bone, mesentery, retroperitoneum, pancreas, stomach, and "left lobe of liver, several internal organs." This wound would also have been independently fatal. Little's left buttock had another gunshot wound that damaged muscle and bone and was recovered from his abdomen. His left buttocks had four wounds total.

Little had an entrance wound on the back of his left upper arm. The wound went through his arm into his chest and damaged muscle. Another gunshot wound to Little's arm went into his ribcage, lung, "covering of the heart[,]" the coronary artery, and the heart itself. The bullet was recovered by a surgeon in the hospital. Dr. Metcalf testified that this wound would have been a fatal wound. The final gunshot wound documented by Dr. Metcalf went through the "base of the penis" and exited through "the back of the scrotum." Dr. Metcalf reiterated that three of the gunshot wounds would have been fatal independently. He agreed that a "majority of the[] wounds were to the rear or to the side of [] Little[.]"

On cross-examination, Dr. Metcalf testified again that the majority of the wounds were "from the rear[.]" Dr. Metcalf testified that based on the trajectory of some of the wounds, Little was potentially "on the ground" when he was shot. He agreed that some of the wounds were from the side and front, like the gunshot wound to Little's penis.

Eduardo Valenzuela testified that he was twenty years old on March 11, 2017. He stated that he was friends with Chadwick at that time after attending high school together. He elaborated that at the time of the shooting, he had known Little for a "few years[,]" had known Beeby for a "few months[,]" and met Roberts that night at Chadwick's house. He knew the Defendant "vaguely" through Chadwick and had only seen him "a couple of times" prior to March 11, 2017. Valenzuela testified that on the night of the shooting, he drove his Kia Optima to Chadwick's house to spend the night because they were "supposed to go the following day to look at a car in Atlanta." Chadwick, Roberts, Beeby, and Little were there when he arrived at approximately 8:30 p.m. The group took turns playing video games, and at some point, Chadwick and Little left to "go get some marijuana." He did not remember whether Roberts left with them. Valenzuela and Beeby remained at Chadwick's house and played video games. Chadwick was gone for "two hours maybe[,]" and during that time, the Defendant arrived at Chadwick's house. Chadwick called

Valenzuela on the way back to his house and told him that Little had "r[u]n off with his money." Valenzuela described Chadwick as "mad" and "upset[.]" When Chadwick arrived at his house, Beeby realized that they could use "Find My iPhone" to locate Little because Little was using one of Chadwick's old iPhones. Beeby learned that Little was at home. Chadwick asked Valenzuela to drive him to Little's house because his car was having "an overheating problem[,]" and Valenzuela agreed. There was no "discussion about bringing violence over there with any type of weapon" during the drive to Little's house, and Valenzuela did not know that anyone possessed a firearm. He testified that he "expected at most maybe a scuffle, fist fight. [He] did not expect what happened that night to happen."

Valenzuela testified that the drive to Little's house lasted between fifteen and twenty minutes, and he drove the car while the Defendant sat in the passenger seat, Chadwick sat behind the passenger seat, and Roberts sat behind the driver's seat. Upon arriving at Little's home, Valenzuela noticed that Thompson, with whom he was also friends, had his Jeep parked in the driveway. The Defendant and Chadwick went up to the passenger side of the Jeep, and the Defendant remained in front of Chadwick. Valenzuela stated that the Defendant was taller than Chadwick. Valenzuela was looking at his phone because he thought they were "probably going to be there a minute, they're going to argue[,]" when he heard gunshots and saw the "flashes from the gunfire." He testified that the flashes were coming from the Defendant. Valenzuela did not realize that "there was a gun" until he saw the flashes. Chadwick and the Defendant got back into the Kia Optima, and Valenzuela saw the Defendant put a gun "back into his pants" that "looked like a black semiautomatic pistol." Valenzuela "asked [the Defendant] over and over why . . . did you shoot him. And he stated that [Little] looked like he was pulling a gun[.]" The Defendant told Chadwick that he "didn't get it all, but [he] got [Chadwick's] twenty back." Valenzuela drove Chadwick, the Defendant, and Roberts back to Chadwick's house and drove home. After arriving home, Valenzuela called 911 "within 30 minutes" of Little being shot. A copy of the 911 call was played for the jury. Law enforcement arrived at Valenzuela's house approximately ten minutes after his 911 call and searched his vehicle and cell phone and took a DNA sample. Valenzuela told police during his interview that the Defendant was the shooter and reiterated that identification at the preliminary hearing.

On cross-examination, Valenzuela agreed that he tried to help Chadwick find Little before Beeby realized they could use "Find My iPhone" to track him. Valenzuela testified that Chadwick did not have a gun "[t]o [his] knowledge[,]" and he did not see the Defendant with a gun prior to the shooting. He agreed that he had a gun but "didn't carry it with [him]." Valenzuela denied that the Defendant was "expecting to be taken someplace else" after Little's house or that the Defendant or Alyssa put bags in his car. He testified that he expected Little "to get rough" with Chadwick because "that's how [Little wa]s." He agreed that he parked his car in front of Little's driveway. Valenzuela testified that he

was "sure" that the Defendant, not Chadwick, shot Little. He conceded that he did not "see who shot who" but saw the Defendant with the gun when he got back inside the car. Valenzuela did not see anyone inside Thompson's Jeep and did not see Little. He testified that his windows were rolled down when he parked in front of Little's driveway, and Chadwick was standing by the "back of the Jeep" and the Defendant was "further into the driveway. And after he went towards the passenger side of the Jeep [Valenzuela] couldn't see him anymore." Valenzuela was unsure whether Little owned a gun.

On cross-examination, Valenzuela clarified that he saw "muzzle blasts" come from where the Defendant was standing. He elaborated that when he asked the Defendant why he shot Little, the Defendant told him, "I thought he was pulling one, so I popped a cap in his b**** a**."

CPD Investigator Tim Pickard testified that he worked in the fugitive unit. He received a call from the CPD homicide unit on March 12, 2017, informing him that the Defendant and Beeby needed to be located because the Defendant was "possibly involved in the homicide" and was potentially at Beeby's residence. Upon arriving at Beeby's house, Beeby told Investigator Pickard that the Defendant was not there but that the Defendant had hidden a firearm in the woods around Beeby's house. After finding the firearm in the wooded area, Investigator Pickard contacted the homicide unit and crime scene unit and requested that they respond to the scene. Investigator Pickard attempted to locate the Defendant at two different addresses. No one responded at the first address, and he spoke with the Defendant's mother and stepfather at the second address. The Defendant's mother was "cooperative" but did not know where the Defendant was and was unable to reach him. The same day, warrants were issued for the Defendant's arrest, and he was placed on the TBI's "Top Ten Most Wanted list[.]" Investigator Pickard explained that putting the Defendant on the most wanted list was beneficial because it "place[d] a monetary value on locating" the Defendant and "generate[d] tips." It also helped draw media attention to locating the Defendant. On March 14, 2017, the Defendant's mother contacted the fugitive unit and told them that she knew where he was, and they could follow her there. CPD officers, U.S. Marshals, East Ridge Police Department Officers, and Catoosa County Sheriff's Department deputies followed the Defendant's mother to Decatur, Meigs County, where he was located in a house in a rural area. When law enforcement arrived at the house, the Defendant "c[ame] out with his hands up and immediately c[ame] out to [them] and surrender[ed]." Investigator Pickard estimated that the house where the Defendant was located was fifty to sixty miles away from Little's residence. After being taken into custody, the Defendant was transported back to Chattanooga to be interviewed by homicide investigators.

On cross-examination, Investigator Pickard reiterated that they first spoke with the Defendant's mother on March 12, 2017, but she could not contact him. Two days later,

she informed police that he was in Decatur with "some type of relative[.]" He agreed that another fugitive unit officer, Investigator Rowe, had the most contact with the Defendant's mother.

Following the close of the State's proof, the Defendant moved for a judgment of acquittal, which the trial court denied. The Defendant then testified on his own behalf.

The Defendant testified that he was twenty-four years old at the time of trial. He met Little through "music" and "the production of music." He knew Chadwick through "music" and through Beeby and knew Roberts through his ex-girlfriend. The Defendant testified that he had known Little for "a week before the occurrence." He clarified that by "music," he meant he produced electronic music and was "teaching" Little to do the same. He agreed that he had previously pled guilty to a theft charge in Tennessee. He met Valenzuela through Chadwick and estimated that he knew him for a week prior to the shooting. The Defendant stated that he knew that Chadwick and Little were friends and that they smoked marijuana together. He denied knowing that Chadwick and Little were going to buy marijuana on March 11, 2017. The Defendant testified that when he got to Chadwick's house on the night of March 11, 2017, "everybody was mad and screaming and cursing each other and saying . . . an individual had stole[n] something." There were "comments made" that Little had stolen "some music equipment" that was jointly owned by the Defendant and Chadwick, but the Defendant "figur[ed] out later on after everything concluded" that the equipment was actually in a bag "behind a chair" at Chadwick's house. The Defendant stated that he got into Valenzuela's car because he wanted "to get a ride across Chattanooga to . . . East Lake" to a residence where he was "kind of staying[.]" He reiterated that he was only "getting a ride there" and did not know that they were going to Little's house until they stopped at a gas station and the other occupants of the car told him that they were going to Little's house "to talk to him about something."

The Defendant testified that when they arrived at Little's house, he saw "multiple people in the driveway." He had to "use the restroom[,]" to he got out of the car and began walking about the driveway, noticing that "there were people inside of the car" that was in the driveway. He saw Little come outside and asked him if he could use the restroom, and Little "pointed opposite of the vehicle that was in the driveway[.]" The Defendant had only used the restroom "for maybe three or more seconds" when he saw Little and Chadwick arguing with "pistols drawn at each other." When he noticed that the "weapons were drawn[,]" the Defendant ran back to Valenzuela's car. He testified that Valenzuela was driving the car, he sat in the passenger seat, Chadwick sat behind him, and Roberts sat behind Valenzuela. He agreed that when they arrived at Little's house, only he and Chadwick exited the car. He denied that Valenzuela's car ever pulled in the driveway or blocked the driveway. The Defendant stated that both Valenzuela's car and Thompson's Jeep had music playing so he could not hear much of Chadwick and Little's conversation,

- 13 -

but he did hear Little tell Chadwick, "[H]ere's your money . . . I got the rest here, hold on." The Defendant saw Chadwick and Little "pushing each other" and both point guns at each other. He saw money in Chadwick's hand but did not see any money on the ground. He did not see the shooting but heard "a lot" of gunshots. The Defendant assumed that Chadwick had been shot because Little "was mad" while he and Chadwick argued. The Defendant denied offering to help Chadwick get his money back, taking a $20 bill from the ground, and shooting Little. He testified that when he got back inside the car, he asked to borrow Valenzuela's cell phone "to call an ambulance[,]" but Valenzuela said, "[N]o, I'm pulling off[,]" and Chadwick told Valenzuela to "go, go, go." There was no discussion in the car of what had just happened, except Roberts asking, "[W]hat the f***[?]" The Defendant denied telling Valenzuela that he "put a cap in somebody because [he'd] thought he was drawing a gun on" him. Valenzuela drove back to Chadwick's house, and Chadwick told the Defendant that "there wouldn't be enough time for [Chadwick] to take [the Defendant] where [he] was supposed to be going[,]" so Chadwick "would take [him] in his mother's car." Roberts "grabbed a couple of bags" from Chadwick's house, and the Defendant, Chadwick, Beeby, and Roberts got into Chadwick's mother's car. Chadwick dropped off Roberts and Beeby, and he took the Defendant to his cousin's house in East Lake. The Defendant asked Chadwick, "[W]hy did it happen[?]" and advised Chadwick to surrender himself to police. The following day, the Defendant went to his uncle's house in Decatur because "that's where [he] had moved." The Defendant learned that police were searching for him, and his uncle advised him to call an attorney before turning himself in to police. He did not turn himself in when he learned there was a warrant out for his arrest because he was "scared[,]" but he denied that he was "running from law enforcement." The Defendant did not speak to his mother during this time but learned from his cousin that police were on their way to his uncle's house in Decatur. The Defendant denied taking a gun from Chadwick or Little and hiding a gun behind Beeby's house.

On cross-examination, the Defendant testified that he had known Little and Chadwick for a week prior to the shooting. He agreed that he was teaching Little about electronic music and "rais[ing] money so that [they] could raise awareness for certain people" on "GoFundMe[.]" When asked why Little would say that Chadwick shot him, the Defendant stated, "Because he shot him[,] I guess." He did not "ever t[ell] anyone that [he was] teaching [] Little musical electronics[.]" He agreed that he was alternating staying at Chadwick's house and his cousin's house before moving to Decatur, and he never told his mother that he was moving to his uncle's house. He denied that he or his uncle possessed a cell phone. The Defendant clarified that when he arrived at Chadwick's house on March 11, 2017, Roberts, Chadwick, Valenzuela, Beeby, and "Shelley" were already there, and Roberts and Chadwick were arguing about something that was "moved and hid[den]." He did not hear Chadwick complain about money or marijuana being stolen.

- 14 -

The Defendant testified that it took approximately twenty minutes to make a stop at a gas station and arrive at Little's house. The Defendant was drinking alcohol during the drive that he obtained from a refrigerator in his mother's old house where he was "sleeping on hardwood floors[.]" He agreed that he met Chadwick, taught Little "musical mechanics[,]" stayed at Chadwick's house, stayed at his mother's old house, stayed at his cousin's house, and was moving to Decatur all within the same single week. Upon arriving at Little's house, the Defendant saw "three cars" and "some people standing around" in the driveway. The Defendant saw Little wearing a black hoodie and asked if he could use the restroom, in response to which Little pointed towards a GMC Yukon and said "right there." Chadwick and Little were arguing while the Defendant used the restroom. The Defendant clarified that there were actually four vehicles in Little's driveway when counting Thompson's Jeep. The Defendant saw the guns when he came "back around" the Yukon. The gun that Chadwick had "look[ed] like" the one found in the wooded area, and Little's gun was "bigger than" Chadwick's. The Defendant ran back to Valenzuela's car and asked to use his phone to call 911 but did not ask to use Robert's phone when Valenzuela declined because it "was a high tense moment." He did not ask to use his cousin's phone to call 911 when Chadwick took him to his cousin's house in East Lake and did not ask to use a neighbor's phone because it was a "[d]angerous neighborhood[.]" He reiterated that he stayed at Chadwick's house, his cousin's house, and his mother's old house and elaborated that he also stayed in Decatur during the week before the shooting. His cousin typically drove him to Decatur. The Defendant testified that he wanted to wait until he got to Decatur to call 911 and was "too disturbed" to "see what the condition of [Little] was[.]" He did not use his cousin's phone to call 911 on the drive to Decatur. The Defendant testified that he arrived in Decatur on the morning of March 12, 2017. On March 13, 2017, the Defendant asked his cousin to contact his mother to tell him that he was alright. The Defendant also contacted a lawyer on March 13, 2017. He did not know he was on the TBI's most wanted list until March 14, 2017, when his uncle told him, "[T]hey're here to get you." The Defendant stated that he was still wearing the same clothes from March 11 when he was taken into custody on March 14 and gave his clothes to law enforcement.

Following the close of all proof, the jury convicted the Defendant as charged. The trial court merged the felony murder conviction into the first degree premeditated murder conviction. The court imposed a life sentence for the first degree premeditated murder conviction and a fifteen-year sentence for the especially aggravated robbery conviction, to run concurrently to the life sentence. The court denied the Defendant's amended motion for new trial on December 4, 2020, and this timely appeal followed.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant contends the evidence was insufficient to support his convictions for first degree premeditated murder, felony murder,

- 15 -

and especially aggravated robbery.  The State responds that the evidence, when viewed in the light most favorable to the State, would allow a rational trier of fact to find the elements of first degree murder, felony murder, and especially aggravated robbery proven beyond a reasonable doubt.  We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).  "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).  When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence."  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.  Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury."  Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

**A. First Degree Premeditated Murder.**  Regarding the Defendant's conviction for first degree premeditated murder, the Defendant claims the proof at trial was insufficient to support his conviction because the State failed to establish premeditation.  The State argues that there was sufficient evidence from which the jury could have inferred premeditation.

- 16 -

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Clayton, 535 829, 845 (Tenn. 2017) (citing State v. Dotson, 450 S.W.3d 1, 86 (Tenn. 2014); State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003)). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009) (citing State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); Bland, 958 S.W.2d at 660). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. Leach, 148 S.W.3d at 54 (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)).

The Defendant asserts that the only proof of premeditation presented at trial was that Little was shot multiple times, which, alone, is insufficient to sustain a conviction for first degree premeditated murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992) ("more than the mere fact of 'repeated blows' must be shown to establish first-degree murder"). However, the Defendant fails to recognize the other evidence from which the jury could have inferred premeditation.

Viewed in the light most favorable to the State, the proof at trial showed that the Defendant went to the Little's home with a firearm after learning that Little had taken money from Chadwick, telling Chadwick that the situation would be "handle[d]." Immediately upon encountering Little in his driveway, the Defendant held the unarmed Little at gunpoint demanding to know about Chadwick's money. The Defendant then fired fifteen shots at Little, with Little's wounds indicating that some of the shots were inflicted from behind, potentially while Little was already on the ground. After shooting Little, the Defendant fled the scene without rendering aid or calling for help. Near Beeby's neighborhood, the Defendant disposed of the firearm and switched shirts with Beeby, removing evidence of the killing from his person.

A rational jury could infer that the Defendant's taking of a firearm to confront Little at his home, using the firearm on the unarmed Little, firing multiple shots at Little, fleeing the scene without rendering aid, and disposing of evidence related to the killing demonstrated premeditation. See Kiser, 284 S.W.3d at 268-69. Furthermore, the placement of the wounds on the Little's backside suggesting that the Defendant shot Little

as he was attempting to retreat or after he had fallen to the ground supports an inference of premeditation. See Bland, 958 S.W.2d at 660 (the fact that the defendant shot the victim as the victim was retreating was a factor from which the jury could logically conclude the existence of premeditation). Finally, the jury was entitled to infer premeditation from the Defendant's statement that the situation would be "handled" prior to committing the murder as evidence of a motive to commit the crime. See Leach, 148 S.W.3d at 54 (the jury could have reasonably inferred premeditation from the defendant's desire to evade arrest as motive to commit the murder).

We conclude the evidence was sufficient to support the conviction of first degree premeditated murder, and the Defendant is not entitled to relief.

**B. Felony Murder and Aggravated Robbery.** The Defendant further contends his convictions for especially aggravated robbery and felony murder, which depends upon the robbery conviction, were not supported by sufficient evidence because the State failed to establish the Defendant committed a theft or that he intended to do so. The State responds that there was sufficient evidence to show that the Defendant committed a theft and to support a finding of intent.

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2). A conviction for felony murder requires proof that the defendant intended to commit the underlying felony. Id. § 39-13-202(b).

In the instant case, the Defendant was convicted of especially aggravated robbery. Under Tennessee Code Annotated section 39-13-403, a person commits especially aggravated robbery when he commits a robbery with the use of a deadly weapon and the victim suffers serious bodily injury. Id. § 39-13-403. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). A person acts intentionally when his conscious objective or desire is "to engage in the conduct or cause the result." Id. § 39-11-302(a). "A jury may infer a criminal's intent from the surrounding facts and circumstances." State v. Roberts, 943 S.W.2d 403, 410 (Tenn. Crim. App. 1996).

The Defendant claims "there is nothing to show that [the Defendant] robbed or intended to rob [Little]" because the witnesses who testified about the Defendant taking money from Little gave conflicting testimony at trial. Specifically, the Defendant notes that Valenzuela initially denied seeing any money during his direct examination and only testified to the contrary after "being prompted by the State." He also notes that although Roberts testified she saw the Defendant give Chadwick money taken from Little, she also

testified she was on her phone during the shooting. The Defendant's contentions are without merit.

Viewed in the light most favorable to the State, the proof at trial showed the Defendant, after discovering that Little had taken $900 from Chadwick, took a gun to Little's home, telling Chadwick they would "handle it." Arriving at Little's home, the Defendant told Chadwick to "get ready" before they both got out of the car to confront Little. Trial testimony from multiple witnesses showed the Defendant held Little at gunpoint while he or Chadwick demanded to know about the missing $900. After shooting Little, the Defendant and Chadwick returned to the car where Valenzuela and Roberts were waiting. Valenzuela and Roberts testified that, after getting into the car, the Defendant apologized to Chadwick because he was only able to retrieve $20 from Little and handed him a $20 bill.

The jury was entitled to find the Defendant committed a theft based on the witnesses' testimony that the Defendant gave Chadwick $20 immediately after pulling a gun on Little over the missing money. The Defendant's contention that the testimony of Valenzuela and Roberts is insufficient because they gave conflicting testimony at trial is without merit. The jury heard all the testimony and obviously accredited the testimony of the witnesses over that of the Defendant. This Court neither "re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Bland, 958 S.W.2d at 659. Furthermore, a rational jury could infer the Defendant intended to rob Little based on the Defendant taking a firearm to confront Little over the money, telling Chadwick they would "handle it" and to "get ready" right before confronting Little, and demanding Little give him and Chadwick the money while holding him at gunpoint. These facts demonstrate the Defendant possessed a conscious objective to take the money from Little. That the Defendant was unable to retrieve more than twenty of the more than $900 that Little possessed is irrelevant. Accordingly, the Defendant is not entitled to relief.

C. **Weight of the Evidence.** The Defendant finally contends that certain favorable evidence was given no weight at trial. Specifically, he claims Little's dying declaration that Chadwick was the person who shot him and the fact that gunshot residue was found on Chadwick's jeans and on the rear passenger door of Valenzuela's car (where Chadwick was sitting in the car) created reasonable doubt that the Defendant was the one who shot Little.

"[T]he perpetrator's identity is an essential element of every criminal offense." State v. Bell, 512 S.W.3d 167, 198 (Tenn. 2015) (citing Rice, 184 S.W.3d at 662). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial

evidence, or a combination of the two. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Bell, 512 S.W.3d at 198 (citing State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005)). In resolving questions of fact, including determining the identity of a perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" State v. Pope, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting State v. Hornsby, 858 S.W.2d 892, 897 (Tenn. 1993)).

Contrary to the Defendant's claims, there was sufficient evidence for the jury to determine the Defendant was the shooter even after considering Little's dying declaration and the presence of gunshot residue on Chadwick. The trial testimony of Roberts, Valenzuela, and Dontae all identified the Defendant as the shooter. As trier of fact, the jury was entitled to weigh the evidence as it deemed fit and find that the Defendant shot Little. Campbell, 245 S.W.3d at 335. Further, the jury, as was its providence, obviously accredited the testimony of Dontae, Roberts, and Valenzuela over that of the Defendant and resolved the questions of fact regarding whether the Defendant or Chadwick was the shooter. See Pope, 427 S.W.3d at 369. The Defendant is not entitled to relief.

## CONCLUSION

Based on the above reasoning and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE

- 20 -